UNITED STATES DISTRICT COURT      SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Tucker Energy Services, Ltd. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| *versus* | § | Civil Action H-05-1265 |
| | § | |
| Hydraquip Corp., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## Findings of Fact and Conclusions of Law

1.   *Background.*

   A.   *Parties.*

   Tucker Energy Services, Ltd., owned and operated the *Miss Nevelyn*. The *Miss Nevelyn* was self-propelled, three-legged jack-up crane boat. She operated with six hydraulic pumps – four pumps for the legs and two for the crane. Hydraquip Corp. designed her hydraulic jacking system.

   BJ Chauvin was an engineer for Flambeau Controls, Inc., and was hired by Hydraquip to build the *Miss Nevelyn's* hydraulic system. Chauvin directed an overhaul of this jacking system in 2000. Chauvin also responded to technical problems for the crew over the telephone.

   In April 2004, the *Miss Nevelyn* was in Guayaguare Bay, about two miles from Point Galeota off the northeast coast of Trinidad. In addition to housing crew and equipment, she was helping lay a pipeline for Harbert International.

   B.   *The Condition of the Miss Nevelyn.*

   In 2000, Tucker put a larger crane on the *Miss Nevelyn's* starboard side. According to some crew, the weight of the crane caused her to list starboard. Anthony Thomas, who coordinated offshore maintenance for the *Miss Nevelyn*, said that he warned management of the problem, but was ignored. Alec Ward, Tucker's land-based operations manager and Thomas's direct supervisor, says he did not know that she listed. Thomas testified that Ward also

ignored other maintenance problems to save money.   Part of Ward's job included countersigning purchases for the *Miss Nevelyn*.

The crew and Tucker also talked about varying states of disrepair of the *Miss Nevelyn's* starboard leg.  Some said that the leg had always jacked slowly.  Others said that it only started having problems jacking in July of 2004.

In late 2003, Tucker cut the hydraulic line to the starboard crane because it was corroded.  As with the other maintenance, testimony varies about the amount of slag in the hydraulic oil that was purged during the cut.

Roy Carpenter, the captain of the *Miss Nevelyn*, said that the crew changed the hydraulic oil many times after cutting the line because the oil was contaminated with bits of wire, metal shavings, slag, and algae. Michael Gordon, an engineer on her, testified that the oil was changed only twice – right after the cut and just before the boat collapsed.  Gordon did not note in his repair log or testify about heavily contaminated oil samples or worn gears on the starboard leg.  The hydraulic oil was normally changed once a year – its replacement required approval from Ward.  Ward said that he was not told about problems with the oil or extra oil changes.  When the final hydraulic oil sample was taken in August of 2004, just before Chauvin arrived, Thomas saw that it had metal shavings and slag in it.

C.     *The Capsizing.*

By August of 2004, the starboard leg would only jack upward ten feet.  Above that height, Carpenter had to "inch it up," by raising the port side above the starboard side and letting the pressure level the starboard leg, little by little.  This process took five hours to raise the vessel an additional twelve feet, bringing the platform about 20 feet above the water.

Carpenter said that he was afraid that if he lowered the vessel he would not be able to raise her again.  He recommended all non-essential personnel leave the boat, but Tucker told him that everyone would remain until the job was complete.  Ward and Thomas said that they never heard Carpenter request that the crew leave the ship and there is no log entry about the request.

Tucker called Hydraquip for help with fixing the leg.  Both Tucker and Hydraquip called Chauvin.  Chauvin told the crew to inspect the electric controls.  Chauvin offered some initial diagnostic tests such as changing the programmable logic chip, checking the brake solenoids, and changing the planetary gears. When troubleshooting over the telephone did not

work, Chauvin went to the boat.  He looked at the last oil sample taken and later testified that it looked worse than any sample he had seen in his career.

Chauvin tested the electrical system.  It worked.  Then he inspected the hydraulic system.  He switched the valve groups on the starboard and port legs.  The valve group is a stack consisting of brake section, a directional valve, and a relief valve.  When switching the entire stack did not work, Chauvin adjusted the relief valve within the stack.  Gordon said that he warned Chauvin that the ship's manual stated that the setting on the relief valve should not be altered.  According to Gordon, Chauvin ignored him and assembled a hybrid stack using a relief valve from an older stack, which he was able to adjust.  With the pressure higher than normal, all of the legs were able to jack.  Once the regular hoses from the stack were reconnected, however, none of the legs would work.

Next, Chauvin increased the pressure from 3,500 psi to 4,500 psi.  With this change the other legs worked, but the starboard leg was still slow.  During the testing, a brake hose ruptured and had to be repaired.

Chauvin concluded that the proportional-stack and relief valve did not affect the starboard leg.  He then turned to the brakes.  He ordered Captain Carpenter to pressurize the hydraulic system and jack the port leg up two inches.  As he checked the port brakes, he heard a strange sound.  He then signaled to Carpenter to raise the starboard leg.  It moved up a few inches, there was a loud noise, and the starboard leg collapsed.  Carpenter released the leg to neutral when the boat started falling, but it was too late and the brakes did not lock.  He then hit the emergency brake, but it also failed.  The boat capsized.

Chauvin fell into the water.  Heavy machinery and equipment slid off the deck.  He was afraid that the equipment might hit him, but it did not.  The water was about 50 feet deep.  Chauvin was briefly under water and testified that he has trouble remembering exactly what happened.  Another crewman promptly pulled him to safety.  No one was injured beyond cuts and bruises.

D.     *Chauvin's Symptoms.*

Except for some minor bumps and bruises, Chauvin was not physically harmed when the *Miss Nevelyn* capsized.  He returned to work one month later and is still employed.

Nearly a year after the boat sank, Chauvin said that he started to experience some psychological abnormalities.  He said that he could not concentrate, double-task, or compute

mathematics in his head like he used to.  He also complained of nightmares and a general aversion to going to the sea, crossing bridges, and watching movies and television programs where accidents happened at sea.  He said that he had less interest in hobbies or interacting with his family.

His wife corroborated his testimony and said that in her opinion, his changed disposition almost ended their marriage but did not.  She was also upset that it took Chauvin eight days to tell her the details of the incident.

Chuavin saw Dr. Gregory Ciaccio in August of 2005.  Ciaccio diagnosed him with post-traumatic stress disorder and prescribed him five milligrams of Lexapro, an anti-depressant, daily.  Chauvin took the drug irregularly and soon stopped taking it completely without consulting the doctor.

In March of 2007, he saw Dr. Dudley Stewart.  Stewart agreed that he had post-traumatic stress disorder and recommended that he resume taking Lexapro.  Three weeks later, he told Stewart that he had not been taking his medication regularly and wanted to get past the incident on his own.  On Stewart's advice, he started taking the pills again, only to stop again in May.

Next, Chauvin saw Dr. Priscilla Ray in August of 2007.  She also concluded that he had post-traumatic stress disorder.

In April of 2008, he returned to Stewart, complaining again about concentration, compartmentalizing, and memory.  Stewart referred him to Dr. Susan Andrews for neurological tests.  Andrews concluded that he had post-traumatic stress disorder but no traumatic brain injury.

In his report, Stewart suggested that Chauvin consult a doctor about hyper-baric oxygen treatment in case he had residual damage from oxygen deprivation.  He did not.

At trial, Ray testified that Chauvin would have benefitted initially from consistent therapy and drug protocol.  Given his strong and willful personality, however, she thought that he would be best working through it on his own as a long-term solution.

2.      *Legal Application.*

    A.      *Seaman.*

National law allows an injured seaman to sue the ship's owner in negligence in addition to the traditional action based on the vessel's unseaworthiness.   Not defined in the act, a

seaman is someone assigned to work on a vessel and whose duties contribute to the vessel's function or mission. A seaman's connection to the boat must be substantial in nature and duration. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 357 (1995).

Chauvin was not a member of the crew. Tucker did not employ him. He was an employee of Flambeau, a company hired by Hydraquip to build the boat's hydraulic controls. Chauvin only came aboard to continue the technical assistance that he had begun over the telephone. His stay was limited to an episodic repair. He had only been on the boat one other time. Four years earlier, he had reprogrammed the jacking controls. His connections with the vessel are not substantial; he is not a seaman.

     B.     *Seaworthiness.*
          1.     *Seiracki Seaman.*

The warranty of seaworthiness extended to those who did the same type of work as seamen but did not qualify as one for Jones Act relief. *Seas Shipping Co., Inc. v. Sieracki*, 328 U.S. 85, 99 (1946). This extension was found when a stevedore loaded cargo on a ship and the boom and tackle fell on him. The court held that a longshoreman injured aboard a vessel could recover from the vessel's owner on the misguided theory that ship owners were in a better position to distribute the loss from accidents than individuals. Besides the erroneous economics, longshoremen are not seamen, and the text of the statute simply said "seamen." A few years later, *Sieracki* protectionism was extended to a carpenter who slipped and fell through an uncovered hatch. *Pope & Talbot v. Hawn*, 346 U.S. 406, 413 (1953). The carpenter was adjusting the grain-loading equipment so it would distribute evenly. The court said that despite his status as a mechanical, shore-based contractor, he was entitled to the same protection from unseaworthiness as the crew.

Soon after, the court faced a problem that it created by allowing some non-seamen to recover for injuries from conditions that they themselves created. Rather than barring the non-seaman's action, if the stevedore caused the injury, the court allowed the shipowner to seek indemnity from the worker's employer based on the warranty of workmanlike service. *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124, 131-32 (1955) (shipowner could seek indemnity when roll of pulp-board that had been stacked incorrectly by the stevedore fell on the stevedore's longshoreman). This warranty covers parties who have not directly contracted.

*Walters v. Tidewater Fleet, Inc.* , 847 F. Supp. 464, 467 (E.D. La. 1994) (warranty of workmanlike performance extended from the subcontractor of obligor to the obligee).

In 1972, the Longshoremen's Act was amended, precluding those covered from claiming *Seiracki* status. The Fourth Circuit has prudently hailed this as the death of this pseudo-seaman status – even for those, like Chauvin, who are not covered by the Act. *See, e.g., Harwood v. Partrederiet AF 15.5.81*, 944 F.2d 118, 1190 n.1 (4th Cir. 1991) (*citing United States Lines, Inc. v. United States*, 593 F.2d 570 (4th Cir. 1979)). However, this circuit has held that dock and maritime workers who are injured in a foreign country, outside of the Act's jurisdiction, can still pursue recovery as a *Seiracki* seaman. *Aparicio v. Swan Lake*, 643 F. 2d 1109, 118, n. 17 (5th Cir. 1981), *Cormier v. Oceanic Contractors, Inc.*, 696 F. 2d 1112, 1113 (5th Cir. 1983) (affirming *Seiracki* recovery for a welder who fell while working on a barge moored for loading in Dubai), *Coats v. Penrod Drilling Corp.*, 785 F. Supp. 614 (S.D. Miss. 1992), aff'd on reh'g en banc, 61 F.3d 1112 (5th Cir. 1995) (repairman fixing jack-up rigs belonging to different customers but who lived on shore was a *Seiracki* seaman).

Chauvin was not a *Seiracki* seaman. He worked on the *Miss Nevelyn* while it was stationary. He was brought in as a specialist because he had designed the hydraulic controls. He was not merely performing the tasks of a ship's engineer – in fact, he had already exhausted the engineer's ability to troubleshoot over the telephone. His lodging on the boat during the repairs was merely a function of the boat's position offshore rather than an indication of his becoming a *Seiracki* seaman.

Chauvin also was not a borrowed employee. He was not under Tucker's direction or control. The crew deferred to him for repairs. He called the shots. Chauvin served as the team-leader for diagnosing the problem with the starboard leg. He was an independent contractor.

2.    *Indemnity.*

Tucker says that if it owes a duty of seaworthiness to Chauvin, it can seek indemnity from Flambeau. *Ryan* indemnity extends to parties who have not contracted. *Walters v. Tidewater Fleet, Inc.*, 847 F. Supp. 464, 467 (E.D. La. 1994) (warranty of workmanlike

performance extended from subcontractor of obligor to the obligee).   Although Tucker contracted with Hydraquip and not directly with Flambeau, it can still seek indemnity under this theory.

Flambeau points to its settlement with Tucker as another reason that Tucker from seeking indemnity.  However, the settlement does not prevent a claim for indemnity by Tucker that arises from Tucker's liability to Chauvin.  The settlement says that "this document does not affect the claims made by . . . BJ Chauvin."  Tucker's claim for indemnification is dependent on Chauvin's personal injury claim.  It could not have been brought by itself.  If Chauvin were to recover his damages from Tucker under the non-seaman theory, Tucker could seek indemnification from Flambeau.

Flambeau also urges that Tucker should not be able to seek indemnity because it and Chauvin should be treated as rescuers, with the legal implication that Chauvin's conduct would be evaluated under a "wanton and reckless" standard. *Furka v. Great Lakes Dredge & Dock Co.*, 824 F.2d 330, 332 (4th Cir. 1987).  Chauvin was not a rescuer because the timing is off.  No one – including himself – needed rescuing until he told the Captain to jack the starboard leg.  His decision to tinker with components outside of his specialty was one of economics and not because anyone was in imminent peril.  Carpenter testified that Chauvin insisted that the boat could not fall; that is hardly a sign of someone perceiving a need to rescue.

> 3.   *Unseaworthy.*

Even assuming Chauvin's status as a seaman or a *Sieracki* seaman, he has not shown that the vessel was unseaworthy.  Tucker has a duty to its seamen to furnish a vessel and equipment reasonably fit for their normal job. *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 208 (1996), *citing Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960).  A seaman can then recover when an unseaworthy condition directly injures him.

The *Miss Nevelyn* had no significant problems until late in the summer of 2004.  She may have listed, may have jacked slowly on the starboard side, and may have had some dirty oil.  She was still able to safely perform her functions: reaching job sites, housing workers, and assisting in the laying of pipeline.  Her engineer noted nothing out of the ordinary in his maintenance log.  While Thomas and Carpenter say that the *Miss Nevelyn* had problems and Tucker knew about them, these problems are not corroborated by any hard data.  Gordon

would have entries in his log.  Ward would have change orders and invoices.  The absence of this kind of evidence indicates post-incident blame shifting and excuses rather than signs of unseaworthiness negligently ignored by Tucker.

Further, the limitation on the vessel's liability cannot be broken unless the unseaworthy condition was present at the beginning of the      voyage and was reasonably discoverable to Tucker's managing agent. *Brister v. A.W.I., Inc.*, 946 F.2d 350, 359 (5th Cir. 1991).  The most that Tucker could have known in April of 2004, when the *Miss Nevelyn* left port, was that the starboard leg jacked slower than the port leg.  The leg did not become inoperable until sometime in late July, while she was at sea.

4.    *Chauvin's Contribution.*

Workers cannot recover for injuries resulting from defective conditions that they were hired to fix.  *Compare Mock v. Upper Miss. Towing Co.*, 336 F. Supp. 468, 472 (E.D. La. 1971) (grain unloader injured when sent to repair a cable on barge could recover because the repair was incidental to his main function of unloading the grain), *with Pinion v. Mississippi Shipping Company, Inc.*, 156 F. Supp. 652 (E.D. La. 1957) (subcontracted plumber was only onboard to fix the pipes).

When the starboard leg stopped, Tucker promptly hired Hydraquip to fix it.  Hydraquip had Flambeau send Chuavin.  Although he says that he only considered himself the expert on the jacking system, the crew deferred to him for repairs on different components – and he eagerly took on that role.  At any time, he could have said that he was working outside of his area of expertise and thought it imprudent to continue.  Instead, he made a business decision to try risky repairs rather than call a halt to the operation.  He put his client relationship and faith in his own ability ahead of a conservative approach.  Sometimes, this works – this time, it did not.  Tucker paid him to weigh the data and decide the best course of action.

Chuavin also cannot claim an unseaworthy condition in the malfunction that he created.  The leg broke because Chauvin signaled to Carpenter to raise it.  Once Chauvin had realized that the problem was not with the electric controls, his technical area, he should have recommended that the ship be taken to port for more tests.  Instead, he tested other potential causes outside of his specialization. Because of his order to the Captain, the ship capsized.  Not only is Chauvin precluded from recovering for an injury arising from a condition he was sent

to fix, he cannot recover from an injury from an accident that he caused. *See Byars v. Moore-McCormack Lines*, 155 F.2d 587, 588 (2nd Cir. 1946), *Mock v. Upper Miss. Towing Co.*, 336 F. Supp. 468, 472 (E.D. La. 1971).

Here, the sole reason for Chauvin's presence on the ship was to repair her leg. The repairman exception to the warranty of seaworthiness, as well as his own negligence, bar his recovery.

      D.     *General Maritime Negligence.*

Shipowners owe a duty of reasonable care to visitors and invitees on their vessels. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959).

Nothing in the record reliably suggests that Tucker carelessly maintained the *Miss Nevelyn*. There seems to have been some abnormality with the hydraulic oil, but Chauvin cannot show how this contributed to the collapse that caused his injury. It is certain, though, that the leg collapsed after Chauvin signaled to Carpenter to raise the boat. Carpenter followed Chauvin's orders. Although Carpenter could have ignored him and insisted that they bring the boat to safe harbor, it was reasonable for him to defer to a person hired to fix the boat. Carpenter's cooperation was not negligent.

      E.     *Injury.*

If Chauvin could recover, his damages would be limited to his emotional trauma. Emotional injuries must be the result of a physical injury to be compensable at law. *Gough v. Natural Gas Pipeline Co.*, 996 F.2d 763, 765 (5th Cir. 1993). Chauvin's only contact was with the water from a modest height. There is no evidence that he lost consciousness. No equipment struck him. His emotional problems are not based on a physical injury.

As for Chauvin's emotions, he sought treatment sporadically and did not follow prescribed courses.

Noting his trait for self-sufficiency, Dr. Ray testified at trial that Chauvin's ideal treatment would have been an initial therapy and regular use of his Lexapro, followed by letting him move on by himself. Had Chauvin followed this course, his reasonable medical expenses would be $14,080. This figure includes one hour of therapy every two weeks for one year at an hourly rate of $500, plus a one-year supply of Lexapro at $90 per month (price rounded up from drugstore.com).

Falling from a sinking boat is unpleasant.  It is entirely reasonable that Chauvin would have emotional problems afterwards, requiring counseling.  But to award him additional damages for past, present, and future mental anguish would ignore the facts.  Chauvin was working one month after the accident.  He testified to nightmares after the accident, but they did not stop him from pursuing gainful employment.  A stress or dislike of going out to sea is not compensable.  Chauvin cannot recover for this vague and persistent-yet-dwindling apprehension that does not amount to mental anguish.

Chauvin abandoned his claim for lost wages.

3. *Conclusion.*

B.J. Chauvin will take nothing from Tucker Energy Services, Ltd.

Signed on August 31, 2010, at Houston, Texas.

Lynn N. Hughes
United States District Judge